FILED
2015 Sep-17  AM 09:14
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

SANDRA TUCKER, etc., et al.,    )
    )
         Plaintiffs    )
    )
    vs.    )    Case No.  7:13-cv-01792-HGD
    )
CITY OF BRENT, ALABAMA,    )
a municipal corporation, et al.,    )
    )
         Defendants    )

## <u>MEMORANDUM OPINION</u>

The above-entitled civil action is before the court on the Motion for Summary Judgment filed by defendants.  (Doc. 12).  Plaintiffs have filed a response (Doc. 22), and defendants have filed a reply (Doc. 25).  The parties have consented to the exercise of jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and LR 73.2.

Plaintiffs, Sandra Tucker, individually and as Executrix of the Estate of James T. Tucker, deceased, and Jeffery Easley, commenced this action by filing a complaint in the Circuit Court of Bibb County, Alabama, on August 16, 2013.  The complaint names as defendants the City of Brent, Alabama, and Ricky Heard, individually and

as the agent and servant of the City of Brent. Plaintiffs assert causes of action against Heard and the City of Brent for violation of Fourth Amendment rights, pursuant to 42 U.S.C. § 1983, and a claim against the City of Brent for negligent hiring, training and retention. Defendants removed the action to this court on September 26, 2013, based on the inclusion of a claim pursuant to 42 U.S.C. § 1983, conferring federal question jurisdiction on this court.

In response to defendants' motion for summary judgment, plaintiffs have stated that they not oppose the motion for summary judgment with respect to the claims for the Estate of James T. Tucker, and with respect to their claims against the City of Brent. (Doc. 22 at 5, 7). Therefore, summary judgment is due to be granted in favor of all defendants with regard to all claims by the Estate of James T. Tucker, and summary judgment is due to be granted in favor of the City of Brent, Alabama, with regard to all claims by all plaintiffs. This leaves the claims of plaintiffs Sandra Tucker and Jeffery Easley against defendant Ricky Heard for alleged violation of their Fourth Amendment right to be free from illegal detention.

## SUMMARY JUDGMENT STANDARD

This matter is considered by the court pursuant to the provisions of Rule 56, Fed.R.Civ.P. Summary judgment "shall [be granted] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Rule 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Id*. at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). However, "[a] court need not permit a case to go to a jury when the inferences that are drawn from the evidence and upon which the non-movant relies are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 593, 106 S.Ct. at 1359. It is, therefore, under this standard that the court must determine whether the plaintiffs can meet their burden of coming forward with sufficient evidence as to each material element of their claims sufficient to permit a reasonable jury to find in their favor.

## EVIDENTIARY ISSUES

The court notes that plaintiffs sought to strike portions of the affidavit of Ricky Heard and test results of James Tucker, as inadmissible hearsay. (Docs. 23 & 24). The motions were deemed moot pursuant to revisions to Rule 56(c)(2), Fed.R.Civ.P., and the Advisory Committee Comments thereto. Nonetheless, the evidentiary questions raised by the motions still must be addressed.

1.    **Test Results**

Plaintiffs ask the court to strike the "test results" of James Tucker as hearsay. While plaintiffs do not specify which tests are at issue, it is assumed they mean the laboratory test results of Tucker's blood alcohol level on the night of the accident (DX 6 at 21). Federal Rules of Evidence and federal law govern the admissibility of evidence. Federal Rule of Evidence 801 prohibits hearsay evidence, to the extent it is used to prove the truth of the matter asserted. Hearsay could not be used for that purpose at trial. *See* Fed.R.Evid. 802; *see also* Fed.R.Evid. 105. The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote omitted) (internal quotation marks omitted). Nevertheless, a district court may consider hearsay evidence in passing on a motion for summary judgment if the evidence could be reduced to admissible form at trial. *Id.* at 1323 (internal quotation marks omitted).

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Hearsay is inadmissible unless it falls within an enumerated exception. One such exception is for business records of a regularly conducted activity. Defendants assert that the business records exception to the hearsay rule

found in Federal Rule of Evidence 803(6) applies to the test results at issue.  In

pertinent part, the Rule excludes from the hearsay rule:

> [a] memorandum, report, record, or data compilation, in any form, of
> acts, events, conditions, opinions, or diagnoses, made at or near the time
> by, or from information transmitted by, a person with knowledge, if kept
> in the course of a regularly conducted business activity, and if it was the
> regular practice of that business activity to make the memorandum,
> report, record, or data compilation, all as shown by the testimony of the
> custodian or other qualified witness, unless the source of information or
> the method of circumstances of preparation indicate lack of
> trustworthiness.

Fed.R.Evid. 803(6).   The Eleventh Circuit Court of Appeals allows a broad

construction of Rule 803(6).  *See Itel Capital Corp. v. Cups Coal Co., Inc.*, 707 F.2d

1253 (11th Cir. 1983).

> In order for evidence to be admissible under Rule 803(6),

> the following elements must be satisfied prior to the introduction of
> business records: (a) the document was made at or near the time of the
> events recorded; (b) by or from information transmitted by a person with
> first hand knowledge; (c) made and kept in the course of regularly
> conducted business activity pursuant to a regular practice of that
> business activity; and (d) all of the above are shown by the testimony of
> the custodian or other qualified witness.

*In re National Trust Group, Inc.*, 98 B.R. 90, 91 (Bkrtcy. M.D.Fla. 1989). "Rule

803(6) does not require that the records be prepared by the business which has

custody of them.  Where circumstances indicate that the records are trustworthy, the

party seeking to introduce them does not have to present the testimony of the party

who kept the record or supervised its preparation." *United States v. Veytia-Bravo*, 603 F.2d 1187, 1191-92 (5th Cir. 1979), *cert. denied*, 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d 658 (1980). The issue of admissibility under Rule 803(6) is chiefly a matter of trustworthiness. In this inquiry the trial court is given great latitude. *See, e. g., United States v. Arias-Izquierdo*, 449 F.3d 1168, 1183 (11th Cir. 2006) ("The touchstone of admissibility under Rule 803(6) is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence."); *United States v. Verlin*, 466 F.Supp. 155 (N.D.Tex. 1979).

Rule 803(6) permits the introduction of business records through a custodian or qualified witness. To be admitted on such grounds, "'the person who actually prepared the documents need not have testified so long as other circumstantial evidence and testimony suggest[s] [the documents] trustworthiness.'" *Itel Capital Corp.*, 707 F.2d at 1259 (quoting *United States v. Parker*, 749 F.2d 628, 633 (11th Cir. 1984)). "'It is not essential that the offering witness be the recorder or even be certain of who recorded the item. It is sufficient that the witness be able to identify the record as authentic and specify that it was made and preserved in the regular course of business.'" *United States v. Langford*, 647 F.3d 1309, 1327 (11th Cir. 2011) (quoting *United States v. Atchley*, 699 F.2d 1055, 1058 (11th Cir. 1983)).

In this case, the medical records from James Tucker's admission to Bibb County Medical Center have been submitted with a certification from the custodian of records.[1]  The records contain a laboratory report dated August 24, 2011, for a test on blood taken from James Tucker at 10:30 p.m. on August 18, 2011.  The report reflects that the test was ordered by Dr. James Blake, the same physician who examined James Tucker at Bibb Medical Center.  *See* DX 6 at 15.  Thus, the document was made at or near the time of the events recorded, by or from information transmitted by a person with first hand knowledge, were made and kept in the course of regularly conducted business activity (hospital and laboratory), pursuant to a regular practice of those business activities.  Further, other circumstantial evidence suggests the test results are trustworthy.  Therefore, the test results are properly considered as evidence under the business records exception.

## 2.   Portions of Affidavit of Ricky Heard

Plaintiffs ask the court to strike certain portions of the affidavit of Ricky Heard (DX 5) as hearsay.  The quoted portions are as follows:

---

[1] The court notes that the signature of the records custodian is not notarized.  However, the court recognizes that the medical records may be properly authenticated at trial through testimony of the records custodian.  Therefore, because the records may be presented in admissible form at trial, they may be considered for purposes of the motion for summary judgment.  *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999); *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996).

On August 18, 2011, I received a call from Bibb County's central dispatcher.  At the time I was on duty and acting within the line and scope of my employment as a Police Officer for the City of Brent.  The dispatcher indicated that an employee of the Bibb Medical Center ("BMC") placed a call to Bibb County 911 regarding the behavior and appearance of a recently admitted patient.  Bibb Medical Center is located in Centreville, AL, but all Centreville officers indicated they were outside the hospital's vicinity addressing other matters.  I therefore communicated with the dispatch office that I would drive to the hospital to investigate the situation and obtain more information.

According to the dispatcher's prior call, a white male had arrived at the Bibb Medical Center, via private vehicle, after sustaining injuries in a motor vehicle collision.  The caller was concerned that the injured person, whom I later learned was named James Tucker, was highly intoxicated.  She further indicated that he was attempting to leave the hospital with the assistance of other persons.  I went to the Bibb Medical Center to obtain more information regarding the complaint, and to compile evidence if it could be substantiated.

(DX 5 at 3-4).

In response, defendants contend that Heard can testify to receiving a call from the Bibb County dispatcher and to the location of Bibb Medical Center because that testimony is from his own personal knowledge.  It is asserted he also can testify to being within the line and scope of his employment as a police officer for Brent.  They also assert that he can testify to the statements made to him by the dispatcher because they are not offered to prove the truth of the matter asserted, but instead to show Heard's state of mind and why he initiated an investigation.  Defendants also contend

that Heard can testify that he went to Bibb Medical Center to obtain information and compile evidence because that it based on is own personal knowledge.

In support of their position, defendants have cited *United States v. Holmes*, 498 Fed. Appx. 923, 925 (11th Cir. 2012) (*per curiam*) ("Statements to law enforcement officers generally may be admitted as non-hearsay for the limited purpose of explaining the course of the officers' investigative actions."); *United States v. Jiminez*, 564 F.3d 1280, 1288 (11th Cir. 2009) (recognizing that "[s]tatements by out of court witnesses to law enforcement officials may be admitted as non-hearsay if they are relevant to explain the course of the officials' subsequent investigative actions," and the detective's testimony about what a witness told him was "not hearsay because it was not admitted to prove the truth of the matter asserted. Rather, it was received . . . for the limited purpose of showing only that the statement was uttered by [the witness] to [the detective]."); and *United States v. Hawkins*, 905 F.2d 1489, 1495-96 (11th Cir. 1990) (holding that statement by an out-of-court witness to a government agent "was properly admissible to explain why the investigation was launched").

In this case, the dispatcher's statement to Heard about the call from someone at Bibb Medical Center is not offered to prove that there was an intoxicated patient who had been involved in an accident, but only to prove that Heard received a report,

which prompted him to begin an investigation at Bibb Medical Center. Therefore, that testimony is not hearsay. The statements made by the 911 caller to the dispatcher would be hearsay and are not admissible to prove that there was an intoxicated patient at Bibb Medical Center; nevertheless, for purposes of establishing probable cause or arguable probable cause, the statements are admissible to reflect what Officer Heard had been advised to prompt his investigation. *See Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012) ("'The fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers.'") . However, the other statements in Heard's affidavit are made of his own personal knowledge and are admissible.

## FACTUAL FINDINGS

The court finds the following facts to be established by the evidentiary submissions of the parties. Where there are factual disputes, the dispute is set out and the evidence is viewed in the light most favorable to the plaintiffs.

On August 18, 2011, James Tucker was involved in an automobile accident in Perry County, Alabama, at approximately 8:30 p.m. (Doc. 1, Complaint, ¶ 1; DX 2, Alabama Uniform Traffic Accident Report). According to the accident report, the Marion Police Department arrived at the scene of the accident at 8:36 p.m. (DX 2). Plaintiff Jeffery Easley received a call on his cell phone advising him that Mr. Tucker

had been involved in an accident.  (DX 3, Easley Depo., at 36).  The Mayor of Marion, Anthony Long, went with Easley to the accident site.  (*Id.* at 37-38).  An ambulance was summoned to the scene, but it was coming from 16 or 17 miles away.  (*Id.* at 40).  Mr. Long asked the Police Officer from the City of Marion "if we could just take [Mr. Tucker] on, and that's when the officer gave us the okay to take him."  (*Id.* at 42-43).  Mr. Easley borrowed Mr. Long's vehicle to transport Mr. Tucker because it was taking too long for an ambulance to arrive.  (*Id.* at 44).

Tucker arrived at Bibb Medical Center near Centreville, Alabama, at 9:36 p.m. on August 18, 2011.  (DX 6, Medical Records).  He sustained injury to the ring and little fingers of his right hand, as well as a small laceration on his head and some bruising on his chest and abdomen from the seatbelt.  (*Id.*).[2]  Tucker's blood was drawn at 10:30 p.m. for an ethanol test, and the test results showed a blood alcohol level of .212%.[3]  (DX 6 at 21).

Defendant Heard is a police officer for the City of Brent, Alabama.  He has been employed by the Brent Police Department since 1997 and graduated from the

---

[2] Mr. Tucker's injuries were more severe than initially assessed at BMC, and he eventually died from chest trauma and congestive heart failure on October 28, 2011.  (DX 7, Death Certificate of James Tucker; DX 4, Tucker Depo., at 51-52).

[3] Alabama law provides that "[a] person shall not drive or be in actual physical control of any vehicle while . . . there is 0.08 percent or more by weight of alcohol in his or her blood . . . ."  *Ala. Code* § 32-5A-191(a)(1).

Police Academy in Tuscaloosa, Alabama, in 1998. (DX 5, Heard Aff., at 2). On August 18, 2011, he received a call from the Bibb County central dispatcher, which in turn was based on a call from someone at BMC about a recently admitted patient, who had arrived in a private vehicle after sustaining injuries in a motor vehicle accident and was about to leave BMC. (*Id.* at 2-3). As a result of the call, Heard began an investigation into the circumstances surrounding Mr. Tucker's presence at the Bibb Medical Center and his transportation to the Bibb Medical Center by private vehicle.[4]

Officer Heard was concerned that the injured person (whom Heard later learned was James Tucker) had left the scene of an accident in violation of *Ala. Code* §§ 32-10-1 and 32-10-6,[5] and whether he was attempting to evade any law enforcement attempting to arrest him, in violation of *Ala. Code* § 13A-10-52.[6] Therefore, Heard

---

[4] There is a dispute as to whether Heard was already at the Bibb Medical Center when Mr. Easley arrived with Mr. Tucker or whether he arrived after they did. *See* DX 3, Easley Depo, at 46-47 and DX 5, Heard Aff., at 2, 6. However, this dispute is not material.

[5] *Ala. Code* § 32-10-1(a) requires any driver of a motor vehicle "involved in an accident resulting in injury to or the death of any person, or in damage to a motor vehicle or other vehicle which is driven or attended by any person, shall immediately stop such vehicle at the scene of such accident or as close thereto as possible and shall then forthwith return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of Section 32-10-3." *Ala. Code* § 32-10-6 provides that any person convicted of leaving the scene of an accident when death or personal injury is involved "shall be punished the same as prescribed by law for a Class C felony."

[6] *Ala Code* § 13A-10-52 provides:

(a) It shall be unlawful for a person to intentionally flee by any means from anyone the person knows to be a law enforcement officer if the person knows the officer is

went to BMC to gather information to ascertain which agency would have jurisdiction over the accident and, if it appeared a criminal violation had occurred, to enforce laws over which he had jurisdiction and/or to assist other agencies with enforcement of the law in a situation in which they had jurisdiction.  (DX 5, Heard Aff., at 3).

Mrs. Tucker was at home on the evening of August 18, 2011, when she received a call from Mr. Easley, telling her that her husband had been involved in an accident and was being taken to Bibb Medical Center.  (DX 4, Tucker Depo., at 20). She dressed and drove to BMC, arriving about 40 minutes later.  (*Id.* at 22).  Mr. Easley met her at the door and escorted her back to the treatment room where Mr. Tucker was located.  (*Id.* at 22, 29).

The testimony of the parties about what occurred at BMC varies significantly. Mr. Easley testified that when he arrived at the BMC emergency room with Mr. Tucker, Officer Heard was already there and looked up when Mr. Easley was talking

---

attempting to arrest the person.

(b) It shall be unlawful for a person while operating a motor vehicle on a street, road, alley, or highway in this state, to intentionally flee or attempt to elude a law enforcement officer after having received a signal from the officer to bring the vehicle to a stop.

(c) A violation of subsection (a) or (b) is a Class A misdemeanor unless the flight or attempt to elude causes an actual death or physical injury to innocent bystanders or third parties, in which case the violation shall be a Class C felony. In addition, the court shall order the suspension of the driver's license of the defendant for a period of not less than six months nor more than two years.

to someone else about driving Mr. Tucker to the hospital.  (DX 3, Easley Depo., at 46-47, 49).  When the nurse took Mr. Tucker into an examination room, Heard walked up to Easley and asked him what had happened, and Easley explained.  Easley told Heard to call the Marion Police Department, but Heard continued to question Easley, in Easley's words, "to see what was going on." (*Id.* at 51-52, 55).  During the inquiry, Heard asked Easley if he knew that leaving the scene of an accident was a felony (which can be true under *Ala. Code* § 32-10-6).  (*Id*. at 62).  Easley testified that Heard did not say anything more to him at this time and just stayed in the area, by which time Mrs. Tucker arrived at BMC.  (*Id.* at 56).

Mr. Easley then testified that after Mrs. Tucker arrived, Officer Heard told him and Mrs. Tucker that they were "in his custody" and "not going anywhere." (*Id.* at 58).  Easley also testified that Heard told him and Mrs. Tucker that they were under arrest.  (*Id.* at 81).  He later testified that Heard pointed at him, Mrs. Tucker and Mr. Tucker and told them they were in his custody.  (*Id*. at 95).  Officer Heard never touched Mr. Easley, nor did he place him in handcuffs.  Despite his testimony that Officer Heard said he was in custody or under arrest and could not leave, Mr. Easley left for the hospital lobby after telling Mrs. Tucker he was leaving.  (*Id.* at 58).  Prior to leaving for the lobby, Mr. Easley never heard Officer Heard talk to anyone on the

phone or make any other call.  (*Id.* at 59).  However, he later testified that he saw Officer Heard on the phone with someone.  (*Id.* at 96).

When Mr. Easley reached the hospital lobby, he observed other police officers arriving, so he returned to the emergency room.  (*Id.*).  After Easley returned to the emergency room, he was told by Officer Heard that he could go.  (*Id.* at 61, 96).  Mr. Easley remained at the emergency room with Mrs. Tucker until Mr. Tucker was released to go to Druid City Hospital in Tuscaloosa.  (*Id.* at 67).

When Mrs. Tucker arrived at BMC, Mr. Easley met her at the door and showed her to the treatment room where her husband was located, along with a doctor and a nurse.  (DX 4, Tucker Depo., at 22-23, 29).  Mr. Easley remained just outside the treatment room.  (*Id.* at 27).  Mrs. Tucker stated she first observed Officer Heard standing by himself across the hall from the treatment room where her husband was located.  (*Id.* at 25-26).  Officer Heard did not speak to her when she arrived.  (DX 4, Tucker Depo., at 30, 37).  However, she testified that her husband was upset because, she understood but did not observe or hear, Heard "was trying to arrest him." (*Id.*).  Mr. Tucker also was afraid he was dying and Mrs. Tucker told him she would take him to Druid City Hospital to see his cardiologist.  (*Id.*).  Mrs. Tucker testified that Officer Heard then came to the doorway of the treatment room with several officers behind him, pointed his finger at her, and told her "you're not going

anywhere" and "you are in my custody and I'm arresting you." (*Id.* at 31, 32, 33-35, 42, 62).  When Mrs. Tucker asked why, Heard told her "for leaving the scene of an accident." (*Id.* at 31, 42-43).  However, Officer Heard never touched her.  (*Id.* at 33, 62).[7]  Mrs. Tucker then said that Mr. Easley needed to call to verify that he had permission to leave the accident scene, so Mr. Easley then left and made a call.  (*Id.* at 31, 40).[8]  Shortly after that, Officer Heard came back and said they were free to go. (*Id.* at 31-32, 42).

In contrast to the deposition testimony of Mr. Easley and Mrs. Tucker, Officer Heard states in his affidavit that when he arrived at BMC, he remained in the emergency room waiting area and did not enter the hallway or any other area of the emergency room.  (DX 5, Heard Aff., at 4).  He also denies ever seeing or speaking to Mr. Tucker while he was at BMC.  (*Id.*).  Heard states that he spoke briefly to Mr. Easley but never came into contact with him or told him he was under arrest.  (*Id.* at 5).  Officer Heard further denies that he ever spoke with Mrs. Tucker or told her she was under arrest, and states he only overheard Mr. Easley and Mrs. Tucker talk about trying to get Mr. Tucker transferred.  (*Id.*).  While in the emergency room, Heard

---

[7] It is undisputed that Officer Heard never touched either Mr. Easley or Mrs. Tucker and never handcuffed them.

[8] Mr. Easley testified that he "called back down there to call and tell somebody to call." (DX 3, Easley Depo., at 61).

maintained contact with the Bibb County dispatcher.  He was advised by the
dispatcher that the Marion County Police Department investigated the accident,
where the accident had occurred, and that there were no charges against Mr. Tucker
based on the accident.  (*Id.*).  After determining that the Marion Police Department
had no charges against Mr. Tucker or anyone else, Heard left the BMC after "a matter
of minutes."  (*Id.*).

### DISCUSSION

There are three categories of police-citizen encounters contemplated within the
Fourth Amendment: (1) police-citizen exchanges involving no coercion or detention;
(2) brief seizures or investigatory detentions; and (3) full-scale arrests.  *United States
v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989).  Interactions falling within the
first category–consensual encounters–are not subject to Fourth Amendment scrutiny.
*United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006).  The Supreme Court has
stated that "[l]aw enforcement officers do not violate the Fourth Amendment's
prohibition of unreasonable seizures merely by approaching individuals on the street
or in other public places and putting questions to them if they are willing to listen,"
and that "[i]f a reasonable person would feel free to terminate the encounter, then he
or she has not been seized."  *United States v. Drayton*, 536 U.S. 194, 200-01, 122
S.Ct. 2105, 153 L.Ed.2d 242 (2002).  Indeed, "[t]he mere fact that a law enforcement

officer approaches an individual and so identifies himself, without more, does not result in a seizure." *See United States v. Baker*, 290 F.3d 1276, 1278 (11th Cir. 2002) (citing *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Moreover, under controlling case law, the simple act of police questioning does not constitute a seizure. *See Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Factors relevant to this inquiry include, among other things: "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police." *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991). A seizure occurs for Fourth Amendment purposes, however, "'only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained.'" *Craig v. Singletary*, 127 F.3d 1030, 1041 (11th Cir. 1997) (quoting *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

No brightline test separates an investigatory stop from an arrest. Instead, whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances. *United States v. Roper*, 702 F.2d 984, 985 (11th Cir. 1983). Courts

concentrate on the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts relied upon by the officers. *See Courson v. McMillian*, 939 F.2d 1479, 1492 (11th Cir. 1991). The fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest. *See United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985); *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989).

The issue is whether "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement . . . to such extent that he would not feel free to leave." *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987) (citations omitted). The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984);[9] *Phillips*, *supra*. To be more specific, the Supreme Court has said that whether a suspect is in custody turns on whether restrictions on the suspect's freedom of movement are "of the degree associated with formal arrest." *Minnesota v. Murphy*, 465 U.S. 420, 430, 104 S.Ct. 1136, 1144, 79

---

[9] "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3152. (footnote omitted).

L.Ed.2d 409 (1984) (citations omitted) (defendant was not "in custody" for purposes of receiving *Miranda* protection since there was no "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest"); *see California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*per curiam*); *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (*per curiam*)).   Whether a person is in custody is measured by "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

In this case, Officer Heard approached both Mr. Easley and Mrs. Tucker to question them about the circumstances of Mr. Tucker's transportation to Bibb Medical Center in a private vehicle.  Officer Heard did not block or impede their path, and he did not take or retain their identification.  Plaintiffs were not young or uneducated, and they were not questioned by Officer Heard for a lengthy period of time.  Officer Heard was the only police officer present for most of the questioning; other officers arrived later.  Heard did not display any weapons and did not touch either Mr. Easley or Mrs. Tucker.  While Mr. Easley testified that Officer Heard pointed a finger at him and told him he was in Officer Heard's custody and that he

was under arrest, Mr. Easley then left the emergency room area for the lobby area; he obviously felt free to leave.[10]

Even if it is assumed that there was a brief seizure of plaintiffs under the facts taken in the light most favorable to plaintiffs, there still was no constitutional violation. A police officer may conduct a brief investigatory stop of a person. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Taking the facts in the light most favorable to plaintiffs, it was clear that Heard briefly detained Mrs. Tucker and Mr. Easley in order to determine whether they had aided Mr. Tucker in leaving the scene of an accident that he had been involved in while intoxicated and whether they were attempting to evade an arrest. At the time he initiated the detention, Heard was not aware that Easley had been given permission to drive Mr. Tucker to the hospital, nor of the facts surrounding Mrs. Tucker's appearance at the hospital. Once he confirmed this permission with a telephone call, he advised plaintiffs they were free to leave. The detention for purposes of investigation was brief. Under the circumstances as known by Heard at the time he questioned plaintiffs, he was under the reasonable impression that they may have violated Alabama law. Thus, the *Terry* stop, based on this reasonable, but mistaken, belief was valid. *See Heien v. North Carolina*, 574 U.S. ___, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014) (officer's reasonable,

---

[10] Mrs. Tucker stayed with her husband in the treatment room. (DX 4, Tucker Depo., at 43).

but mistaken, belief that defendant had violated state law was sufficient to establish reasonable suspicion to justify *Terry* stop).

Even if it is assumed that Officer Heard placed plaintiffs under arrest merely by telling them they were under arrest, without touching them or otherwise restraining their freedom, Officer Heard would be entitled to qualified immunity because he had arguable probable cause to arrest them for violation of *Ala. Code* §§ 32-10-1, 32-10-6, or 13A-10-52.

Certain officials acting in the exercise of discretionary authority are not liable to pay damages and indeed are immune from suit under the doctrine of qualified immunity. In the event that a defendant claims that he is immune from suit because of qualified immunity, the court must determine that issue as a matter of law. *Swint v. City of Wadley*, 51 F.3d 988 (11th Cir. 1995). In *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1989), the Eleventh Circuit established a two-part analysis for applying the *Harlow*[11] qualified immunity test. First, "the defendant government official must prove that 'he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred.'" *Sammons v. Taylor*, 967 F.2d 1533, 1539 (11th Cir. 1992) (quoting *Zeigler*, 716 F.2d at 849). "[T]hen the burden shifts to the plaintiff to demonstrate that the defendant violated 'clearly established constitutional

---

[11] *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

law.'"  *Id.*, quoting *Zeigler*, 716 F.2d at 849).  The burden is on the plaintiff to demonstrate that the law "in factual terms staked out in a bright line," that the defendant's conduct was unlawful.  *Lassiter v. Alabama A&M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*en banc*).

A state actor is acting within the scope of his discretionary authority when acting pursuant to his job functions and within the scope of their authority.  The term "discretionary authority" then includes all actions of a governmental official that (1) "were taken pursuant to the performance of his duties" and (2) were "within the scope of his authority" whether such actions be characterized as ministerial or discretionary in nature.  *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994).  In this case, Officer Heard was on duty as a police officer and was acting within the scope of his discretionary authority as a police officer when he was investigating and gathering information about Mr. Tucker's transportation to the BMC after the accident, his condition, and whether he was attempting to leave the BMC to evade any charges arising as a result of the accident.  Therefore, the burden is on plaintiffs to establish that Officer Heard violated their Fourth Amendment rights by telling them they were under arrest.

Arguable probable cause is all that is needed to establish the qualified immunity defense when probable cause is an essential element of the constitutional

claim.  The elements of the crime and the fact pattern involved determine whether arguable probable cause existed.  *Skop v. City of Atlanta*, 485 F.3d 1130, 1137-38 (11th Cir. 2007).  Whether a crime actually was committed is irrelevant; rather, the inquiry asks whether objective facts known to the officer supported probable cause to make an arrest.  *Scarorough v. Myles*, 245 F.3d 1299, 1303 n.8 (11th Cir. 2001). "Arguable probable cause" is defined as the situation where "reasonable officers in the same circumstances and possessing the same knowledge" as the arresting officer "could have believed" that the arrestee "had committed or was committing a crime." *Skop*, 485 F.3d at 1137.  If plaintiffs did not produce admissible evidence sufficient to persuade a reasonable juror that Heard did not have arguable probable cause to arrest them for assisting Mr. Tucker in leaving the scene of an accident or fleeing law enforcement attempting to arrest him, then Heard is entitled to qualified immunity from their lawsuit and, in turn, to summary judgment.

The knowledge possessed by Officer Heard at the time he allegedly told plaintiffs they were under arrest, obtained either from the dispatcher or from h8is questioning of plaintiffs, was: (1) an injured person had been transported by private vehicle from the scene of an accident; (2) the person was possibly intoxicated; (3) he was unaware that Mr. Easley actually had been given permission by law enforcement to transport Mr. Tucker from the scene of the accident; and (4) he knew that Mrs.

Tucker proposed to take Mr. Tucker to another location.  Under these circumstances, Heard would have had arguable probable cause to place plaintiffs under arrest for violation of *Ala. Code* §§ 32-10-1, 32-10-6, and 13A-10-52.  Plaintiffs have pointed to no law which would prohibit an arrest given the information he had obtained up to the point he determined Mr. Easley had been truthful with him.  As soon as he determined that Mr. Easley had been given permission to bring Mr. Tucker to BMC, that the Marion Police Department had jurisdiction over the accident, and that the Marion Police Department had no charges pending against Mr. Tucker as a result of the accident, he informed plaintiffs they were free to leave.  Therefore, Heard is entitled to qualified immunity.

## CONCLUSION

Based on the foregoing, the court finds that defendants' Motion for Summary Judgment is due to be granted with respect to all claims asserted by the Estate of James T. Tucker and all such claims dismissed with prejudice, that the Motion for Summary Judgment of the City of Brent is due to be granted with respect to all claims asserted by plaintiffs and all such claims dismissed with prejudice, and that the Motion for Summary Judgment of Ricky Heard is due to be granted with respect to all claims asserted by plaintiffs and all such claims dismissed with prejudice.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 17th day of September, 2015.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE